Opinion
 

 HOLLENHORST, J.
 

 The trial court found that a California Land Title Association (CLTA) form subordination agreement was effective to give the lender’s deed of trust priority over the sellers’ deeds of trust.
 

 
 *841
 
 In the trial court, and in this court, plaintiff sellers vigorously attack this conclusion, contending that riders to the deed of trust set forth conditions of subordination that were agreed to between the buyer and sellers. The sellers contend that the lender had the duty to ensure compliance with the terms of subordination in the riders and, because the lender failed to do so, the lender lost the priority given by the CLTA subordination agreements.
 

 We agree with the trial court that the lender could properly rely on the CLTA subordination agreements. Accordingly, we affirm the judgment.
 

 Facts
 

 Plaintiffs, Karel F. Lindemans, Swiss Property Management Co., Inc., and Western Real Estate Corporation, were the owners of two adjacent parcels of real property located near Rancho California. In 1988, they agreed to sell the properties to Westamerica Properties Group, Inc. for $4.5 million. The sellers agreed to take back deeds of trust as part of the purchase financing.
 

 A rider to the deeds of trust provided that the sellers agreed “to subordinate this Deed of Trust for construction and development financing required for the development of the property consistent with the following criteria: [<H] a. The principal amount secured by such construction loans and Deeds of Trust not to exceed $25,000,000 or 80% of the improved value of the property (such value to be determined by appraisals acceptable to the Lenders) whichever is lower; [<¡0 b. The terms of such loans shall provide that the funds disbursed therefrom are to be used solely in connection with the development of the Property, including land and financing acquisition costs, normal developers overhead costs, property maintenance costs and interest costs; [^Q c. The interest rate on such loans do not exceed an adjustable rate that is 3.0% over the ‘prime’ or ‘reference’ rate selected by such Construction Lender.” The deeds of trust were recorded on June 6, 1988.
 

 The buyer, Westamerica, obtained a loan from the Southern California IBEW-NECA Pension Plan in the sum of $2.2 million. As a condition to making the loan, the pension plan required that it have insured first lien priority. To achieve this priority, and to obtain title insurance, the title company and the pension plan required the sellers to sign unmodified CLTA form subordination agreements. The sellers did so, and the title company issued its title policy.
 

 The CLTA subordination agreements (form “A”) were signed by the sellers without modification and were recorded on June 6, 1988. Among
 
 *842
 
 other provisions, each subordination agreement states that “said deed of trust securing said note in favor of Lender, and any renewals or extensions thereof, shall unconditionally be and remain at all times a lien or charge on the property therein described, prior and superior to the lien or charge of the deed of trust first above mentioned.” Each subordination agreement also states that it “shall be the whole and only agreement with regard to the subordination of the lien or charge of the deed of trust first above mentioned to the lien or charge of the deed of trust in favor of lender above referred to and shall supersede and cancel, but only insofar as would affect the priority between the deeds of trust hereinbefore specifically described, any prior agreement as to such subordination including, but not limited to, those provisions, if any, contained in the deed of trust first above mentioned, which provide for the subordination of the lien or charge thereof to another deed or deeds of trust or to another mortgage or mortgages.”
 

 The lender’s deed of trust was recorded first, followed by the sellers’ deeds of trust, followed by the subordination agreements.
 

 The issue in this case is whether this unconditional language in the CLTA form subordination agreement supersedes the specific terms of the riders to the deeds of trust. As noted above, the trial court found that the CLTA form governs, and that the lender therefore had a first priority position.
 

 Discussion
 

 We are faced, on the one hand, with strong public policy reasons to protect the seller in subordination situations.
 
 (Middlebrook-Anderson Co.
 
 v.
 
 Southwest Sav. & Loan Assn.
 
 (1971) 18 Cal.App.3d 1023 [96 Cal.Rptr. 338] (herein, Middlebrook-Anderson);
 
 Handy
 
 v.
 
 Gordon
 
 (1967) 65 Cal.2d 578 [55 Cal.Rptr. 769, 422 P.2d 329, 26 A.L.R.3d 848].) As our Supreme Court held in
 
 Handy,
 
 “an enforceable subordination clause must contain terms that will define and minimize the risk that the subordinating liens will impair or destroy the seller’s security. [Citations.] Such terms may include limits on the use to which the proceeds may be put to insure that their use will improve the value of the land . . . .” (65 Cal.2d at p. 581.) The sellers here argue that the CLTA subordination agreements are not enforceable under this test. If the CLTA form subordination agreements are not enforceable, the conditions to subordination stated in the riders to the deeds of trust would govern. Even assuming the validity of the CLTA subordination agreement, the sellers argue that the subordination conditions in the riders to the deeds of trust retained sufficient vitality to govern over the contrary provisions of the CLTA subordination agreements.
 

 
 *843
 
 On the other hand, the lender can set the terms and conditions under which it is willing to loan money, including the condition that the security for its loan be an insured first priority position. The lender thus emphasizes its need to have unconditional evidence of subordination to establish that its loan is in a first priority position so that it may obtain title insurance. It stresses the potential unfairness to it if it is found to be bound by subordination agreements between the buyer and seller which are not even communicated to it prior to funding the loan. The lender also emphasizes the usefulness of the CLTA subordination agreement form to clearly establish the conditions of subordination in a single document that the lenders and title companies may rely on.
 

 The plaintiff sellers rely on two cases from this court:
 
 Middlebrook-Anderson, supra,
 
 and
 
 Protective Equity Trust #83, Ltd.
 
 v.
 
 Bybee
 
 (1991) 2 Cal.App.4th 139 [2 Cal.Rptr.2d 864] (herein,
 
 Protective Equity).
 

 Plaintiffs contend that
 
 Middlebrook-Anderson
 
 stands for the proposition that a lender will not obtain priority unless it ensures that there is compliance with the terms of subordination agreed upon between a buyer and a subordinating seller. Since those terms here allegedly required that the loan obtained by the buyer include a provision that the funds would be disbursed solely in connection with the development of the property, since the lender had knowledge of those terms, and since the funds were not so used, plaintiffs argue that no subordination occurred.
 

 Middlebrook-Anderson
 
 was decided on demurrer. It did not involve a written subordination agreement, but rather an automatic subordination agreement in which the seller agreed to subordination by consenting to the recording of its trust deed after recordation of the lender’s trust deed, i.e., subordination by operation of the recording laws. The complaint alleged that the lender (1) knew that the seller would subordinate only on condition that loan funds be used to develop the property; (2) undertook to control disbursements from the construction loan fund; and (3) allowed improper disbursements for nonconstruction purposes.
 
 (Middlebrook-Anderson, supra,
 
 18 Cal.App.3d 1023, 1029.) We stated: “As we interpret the pleadings, the subordination agreement shows the parties intended to enter into an arrangement of subordination whereby the seller relied upon the responsibility of the lender to make voucher payments only for construction purposes and the reliance of the seller was known to the lender. []fl The basic thrust of plaintiffs’ complaint is that the automatic subordination should be voided because of the misapplication of a portion of the construction loan fund, in that the lender failed to comply with the conditions which occasioned plaintiffs’ agreement to subordinate.”
 
 (Id.,
 
 at p. 1031.)
 

 
 *844
 
 We held that . . the duties owed by a lender to a seller under a formal subordination agreement do not differ from the duties owed by a lender to a seller when the lender obtains priority over the seller under an agreement by the seller to record after the lender.”
 
 (Middlebrook-Anderson, supra,
 
 18 Cal.App.3d 1023, 1029.) Accordingly, die fact that there was a specific subordination agreement in this case and automatic subordination by operation of the recording laws in
 
 Middlebrook-Anderson
 
 is not a valid distinguishing factor.
 

 We also cited the strong public policy protecting the seller in subordination situations.
 
 (Middlebrook-Anderson, supra,
 
 18 Cal.App.3d 1023, 1036.) We noted that “[i]t has been pointed out by many courts and commentators that as between the seller and the lender, the lender is by far in the better position to control the use of the loan proceeds and thereby prevent misappropriations by the developer. The lender can require documented evidence that expenses have been incurred and can corroborate this by on-site inspections. It is common for lenders to control disbursements, since they, too, have an interest in preventing misuse of loan proceeds [citation].”
 
 (Id.,
 
 at pp. 1036-1037.) We therefore concluded: “An implied agreement in the instant case can and, in equity, should be spelled out from lender’s alleged actual knowledge of the provisions of the seller’s lien in general, and of the subordination therein in particular. In the superior position of a financial institution constantly engaged in professional construction lending, Southwestern had no reason to believe their trust deed conferred any lien to which the fee was subordinate other than to the extent of money spent for construction purposes. Its loan under the circumstances cannot be viewed other than as subject to the fair application of the construction funds. Accordingly, we conclude that such lien as the trust deed might have conferred on the lender should not be advanced or preferred over the seller.”
 
 (Middlebrook-Anderson, supra,
 
 18 Cal.App.3d 1023, 1037.) Thus, the lender’s failure to protect the seller’s security interest gave seller a cause of action.
 
 (Id.,
 
 at p. 1038.)
 

 Middlebrook-Anderson
 
 thus dealt with an implied agreement that the lender would supervise the expenditure of loan funds. We agree with the trial court that
 
 Middlebrook-Anderson
 
 is not dispositive because in this case there was an express agreement to the contrary, i.e., the sellers signed the CLTA subordination form without modification. As the pension plan points out, it insisted on, and relied on, the form as the basis for making its loan. The sellers’ argument, and fervent wish, is to pretend that the CLTA form subordination agreement was never signed. However, the CLTA form subordination agreement was duly signed and it provides that “Lender in making disbursements pursuant to any such agreement is under no obligation
 
 *845
 
 or duty to, nor has Lender represented that it will, see to the application of such proceeds by the person or persons to whom Lender disburses such proceeds and any application or use of such proceeds for purposes other than those provided for in such agreement or agreements shall not defeat the subordination herein made in whole or in part.” The document also provides, in boldface type immediately above the signature lines: “Notice: This subordination agreement contains a provision which allows the person obligated on your real property security to obtain a loan a portion [of] which may be expended for other purposes than improvement of the land.”
 

 Thus, unlike the implied agreement in
 
 Middlebrook-Anderson,
 
 the sellers here signed a subordination agreement which clearly notified them that the lender would
 
 not
 
 monitor disbursement of funds. If the sellers desired the lender to monitor fund disbursement, they should have raised the issue with the lender before signing the documents.
 
 [1]
 
 Even though they apparently relied on fraudulent representations by the buyer that the lender would monitor the use of funds, they should not have done so in view of the explicit language to the contrary in the CLTA subordination agreements.
 

 To the extent that the pension plan had notice of the riders to the deed of trust, and a concomitant duty to investigate to determine the subordination terms which were acceptable to the seller, we find that the pension plan was entitled to assume that the sellers would not have signed the CLTA subordination agreements if they did not intend them to mean what they say. The pension plan thus justifiably assumed that the terms stated in the riders had been superseded by the CLTA subordination agreements, and that the sellers had changed their position on terms of subordination in order to obtain the loan proceeds. After all, the subordination agreements clearly provide that they supersede all prior agreements on the subject of subordination, and they clearly express the lender’s unconditional need to have its loan in a first priority position. If we accepted the sellers’ argument that the terms of the riders remained in effect, it would mean that the deed of trust riders could not be modified or superseded by any agreement between buyer and seller before closing. If we accepted the sellers’ argument that all of the documents relating to subordination must be construed together (Civ. Code, § 1642), we would still conclude that well-established principles of contract interpretation require that the more recent documents, the CLTA subordination agreements, accurately state the terms of subordination which were finally agreed to between buyer and sellers. (Rest.2d Contracts, § 213, subd. (1): “A
 
 *846
 
 binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them.”) Accordingly, the terms of the CLTA subordination agreements should be given effect. (Civ. Code, §§ 1643, 3541.) As the pension plan points out, any other interpretation would totally ignore and contradict almost every provision of the CLTA subordination agreements.
 

 We thus agree with the pension plan that the parties meant what they said:
 
 “That this agreement
 
 shall be the whole and only agreement with regard to the subordination of the lien or charge of the deed of trust first above mentioned to the lien or charge of the deed of trust in favor of lender above referred to and
 
 shall supersede and cancel,
 
 but only insofar as would affect the priority between the deeds of trust hereinbefore specifically described,
 
 any prior agreement as to such subordination including,
 
 but not limited to,
 
 those provisions,
 
 if any,
 
 contained in the deed of trust first above mentioned,
 
 which provide for the subordination of the lien or charge thereof to another deed or deeds of trust or to another mortgage or mortgages.” (Italics added.)
 

 In other words, we conclude that
 
 Middlebrook-Anderson
 
 would be helpful to the sellers if there had been no CLTA subordination agreements. However, we agree with the pension plan that the sellers’ execution of the respective agreements makes it clear that (1) the loan depended on the execution of the agreement; (2) the agreement superseded the prior agreements relating to subordination; and (3) the agreement clearly notified the sellers that the pension plan would not supervise disbursement of the loan proceeds. Under these conditions, there can be no implied agreement to the contrary, as we found in
 
 Middlebrook-Anderson.
 
 In fact, it appears that the CLTA form subordination agreement was designed to eliminate just such implied agreements.
 

 We agree with the pension plan that
 
 Gluskin
 
 v.
 
 Atlantic Savings & Loan Assn.
 
 (1973) 32 Cal.App.3d 307 [108 Cal.Rptr. 318], is dispositive on this point. In that case, the court recognized the vulnerability of the seller and the strong public policy to protect the seller in subordination situations. In discussing
 
 Middlebrook-Anderson,
 
 the court noted that it “imposed on the lender the obligations of an implied agreement that the lender’s priority extended only to loan amounts properly expended for construction purposes and it is in that context that a seller needs protection.”
 
 (Gluskin
 
 v.
 
 Atlantic Savings & Loan Assn., supra,
 
 32 Cal.App.3d 307, 314.) However, in
 
 Gluskin,
 
 and in this case, the seller expressly waived any rights to have the lender supervise the application of loan proceeds by signing an express agreement to the contrary: “[The seller] thus gave up the major protection to which sellers who subordinate their otherwise prior liens are entitled.”
 
 (Ibid.,
 
 fn.
 
 *847
 
 omitted.) However,
 
 Gluskin
 
 went on to hold that, regardless of express or implied agreements to monitor disbursement of funds, the public policy which requires protection of subordinating sellers imposes on the lender a duty such “that a lender and a borrower may not bilaterally make a material modification in the loan to which the seller has subordinated, without the knowledge and consent of the seller to that modification, if the modification materially affects the seller’s rights.”
 
 (Ibid.)
 
 Using this principle, the sellers argue that a six-month extension of the loan term was a material modification, resulting in a loss of priority. However, we agree with the lender that “[a]n extension of a senior debt that merely alters the date of payments generally does not adversely affect the junior lienholders.”
 
 (Lennar Northeast Partners
 
 v.
 
 Buice
 
 (1996) 49 Cal.App.4th 1576, 1585 [57 Cal.Rptr.2d 435].) There was no evidence here that the extension adversely affected the sellers’ rights or the value of their security. Accordingly, there was no loss of priority under this principle.
 

 Acknowledging the force of the CLTA subordination agreements, plaintiffs next seek to avoid them by relying on
 
 Protective Equity.
 
 In that case, the trial court granted summary judgment to lenders on the basis of the seller’s agreement to subordinate. We reversed, finding that there had been a breach of the subordination agreement: “We hold that the terms of the agreement between seller and buyer were breached by buyer and that the agreement is therefore unenforceable by lenders. Since we have determined that the priority of recording was based only on the subordination agreement, upon failure of that agreement the priority must be reversed and seller’s trust deed must be deemed to be senior to lenders’ trust deed. Therefore, the summary judgment entered in favor of the lenders must be reversed.”
 
 (Protective Equity, supra,
 
 2 Cal.App.4th 139, 151.) Following
 
 Middlebrook-Anderson,
 
 we noted that, in that case, the plaintiff alleged that the lender had undertaken to oversee disbursement of the funds, while in
 
 Protective Equity
 
 the lender had not assured seller that the lender would oversee the use of funds loaned to buyer.
 
 (Id.,
 
 at p. 150.) In construing the terms of the subordination agreement between buyer and seller, we considered the escrow instructions, the subordination agreement, and amended escrow instruction. We noted that it was undisputed that the terms of the agreement under which the seller agreed to subordinate were not complied with and “[i]t is also undisputed that lenders made no representations that they would supervise the use of their loan to buyer. Lenders’ refusal to undertake that supervision, however, did not insulate them from risk of loss in the event that buyer failed to meet the terms of its agreement with seller.”
 
 (Id.,
 
 at p. 151.) Since the agreement had been breached, we held that the lenders could not enforce the subordination agreement.
 

 
 *848
 
 Sellers here present several arguments based on
 
 Protective Equity.
 
 First, they ask us to take judicial notice of the record in
 
 Protective Equity
 
 to establish the fact that the CLTA form agreement used in that transaction was the same as the CLTA form agreement used here. The request is granted to the extent that we judicially notice that the agreement used in
 
 Protective Equity
 
 was CLTA form “B,” rather than CLTA form “A” used here. The essential terms of both forms, before modification, are identical. However, the form used in
 
 Protective Equity
 
 “struck out a provision in the form which stated that seller approved and consented to the provisions of the note and deed of trust in favor of lenders and all other agreements between buyer and lenders, and [seller] also struck a statement giving notice that the subordination agreement contained a provision under which buyer was allowed to use portions of the construction loans for purposes other than improvement of the property.”
 
 (Protective Equity, supra,
 
 2 Cal.App.4th 139, 143.) In contrast, the agreement here was unmodified and the sellers agreed to the terms and conditions of the pension plan loan prior to closing.
 

 Sellers contend that the lender had a duty to comply with the terms of subordination stated in the riders to the deeds of trust. They cite
 
 In re Sunset Bay Associates
 
 (9th Cir. 1991) 944 F.2d 1503 : “[U]nder California law . . . the priority of the lender’s lien is contingent upon the fulfillment of any conditions stated in the seller’s lien, whether or not the lender has actual knowledge of those conditions at the time the deeds are recorded.”
 
 [2]
 

 (Id.,
 
 at p. 1513, and quoted in
 
 Protective Equity, supra,
 
 2 Cal.App.4th 139, 151, fn. 5.)
 

 
 *849
 
 While we have some doubts that California law on this point was accurately summarized in
 
 Sunset Bay,
 
 we need not decide the issue here because in this case, unlike
 
 Protective Equity
 
 and
 
 Sunset Bay,
 
 there was no evidence that the sellers’ conditions of subordination, as stated in the subordination agreements, were breached. Thus, assuming the existence of such a duty, the lender here complied with it because the CLTA subordination agreements remain valid. Since the sellers agreed to the terms of the loan prior to signing the CLTA subordination agreements, and signed the agreements to obtain a loan with those terms, there was no evidence that those subordination agreements were breached by the buyer. The trial court so found, and the sellers’ argument that the conditions of subordination were breached rests solely on the premise that the riders to the deeds of trust continued to state valid conditions of subordination after execution of the CLTA subordination agreements. Since the premise fails, the trial court correctly found no breach of the conditions of subordination.
 

 We therefore find no breach of the sellers’ terms of subordination because the CLTA form subordination agreements validly evidence the sellers’ agreement to supersede the terms of subordination stated in the deed of trust riders. Since the restrictions on subordination were removed by the sellers’ execution of the CLTA form subordination agreements, those restrictions cannot provide a basis for the claim that they were violated.
 

 Sellers attack this latter conclusion by urging us to consider all of the documents regarding subordination together. They point out that
 
 Protective Equity
 
 defines the subordination agreement as consisting of the escrow instructions, the subordination agreement, and amended escrow instructions. All documents on the subject of subordination were thus considered together, despite the language in the CLTA form agreements used in both cases stating that they each contain the entire agreement of the parties regarding subordination.
 

 Protective Equity
 
 did not consider conflicting agreements on the issue of subordination. Instead, it considered modifications made by the seller to the CLTA form agreement, and amended escrow instructions that provided that buyer warranted that the loan proceeds would be used for development of the property. It was there undisputed that this warranty was breached because the construction funds were not used for improvement of the property.
 

 In this case, the terms of the riders to the deeds of trust and the CLTA subordination agreement are irreconcilably conflicting. The conflict was
 
 *850
 
 caused by sellers’ execution of the CLTA subordination agreements after execution of the riders to the deeds of trust. For the reasons stated above, we find that the subordination agreements effectively superseded the riders. Thus, there were no longer conditions of subordination to be breached.
 

 Sellers finally rely on the sentence in
 
 Protective Equity
 
 which states: “As a third party beneficiary of the agreement between seller and buyer, lenders cannot now seek to enforce seller’s obligations under that agreement once the agreement has been breached by buyer.”
 
 (Protective Equity, supra,
 
 2 Cal.App.4th-139, 151.) They contend that the agreement here was breached by the buyer and, as a result, the lender cannot now enforce it. However, as noted above, and assuming the validity of the CLTA subordination agreements, the trial court found no evidence of breach, and sellers do not contend that the evidence is insufficient to support that finding. Thus, we agree with the trial court that the CLTA form subordination agreements were effective to supersede the agreement expressed in the riders to the deeds of trust. Accordingly, there was no evidence of breach of the sellers’ conditions of subordination because the conditions in the riders had been superseded.
 

 As discussed above, if the sellers had desired to insist on the conditions of subordination as stated in the riders to the deeds of trust, they should have raised the issue at the time the CLTA subordination agreements were presented to them to be signed. Instead, they signed the CLTA subordination agreements with the understanding that execution of the documents would allow the loan to be made. It is too late for them now to ask this court to totally disregard the clear and unconditional language in the CLTA subordination agreements in order to reinstate the earlier subordination conditions stated in the riders to the deeds of trust. After all, the lender is entitled to condition the making of a loan on its receiving an insured first priority position. If sellers were not willing to have the loan made on that basis, they should not have signed the CLTA subordination agreements.
 

 Disposition
 

 The judgment is affirmed.
 

 Ramirez, P. J., and Ward, J., concurred.
 

 A petition for a rehearing was denied January 6, 1998, and appellants’ petition for review by the Supreme Court was denied March 25, 1998.
 

 [1]
 

 The sellers did object to the CLTA subordination agreements because they were contrary to the riders. After being told that the pension plan required an unmodified agreement to make the loan, and after discussions among the sellers, they signed the documents.
 

 [2]
 

 In
 
 Sunset Bay Associates,
 
 the Ninth Circuit interpreted California law in reversing the granting of a motion for summary judgment. Sunset Bay Associates, a joint venture which was the buyer of the property, went into bankruptcy. Sellers, Plastino/Brown sued the lender, Eureka, alleging that the loan fees for the project were excessive, and that Eureka diverted funds to other persons. The trial court granted summary judgment in favor of Eureka. The appellate court reversed, holding that questions of fact existed as to whether the lender had actual knowledge of the terms of the sellers’ subordination agreement and whether excessive loan fees were charged. In that case, there was no subordination agreement between the lender and the seller as the lender was merely allowed to record its lien first. However, the court held that the applicable principles were the same as in the case of a subordination agreement between the lender and the seller.
 
 (In re Sunset Bay Associates, supra,
 
 944 F.2d 1503, 1512.) The issue was whether the lender had knowledge of the terms of the promissory note and deed of trust between the sellers and Sunset. The court said: “[W]e conclude that under California law, when a seller subordinates his purchase money lien to a lender’s lien by permitting the lender to record first, and the lender knows that the seller has agreed to record his deed second for the purpose of affecting [sic] a subordination, the priority of the lender’s lien is contingent upon the fulfillment of any conditions stated in the seller’s lien, whether or not the lender has actual knowledge of those conditions at the time the deeds are recorded.”
 
 (Id.,
 
 at p. 1513.) The court therefore found sufficient evidence of such actual and constructive knowledge to overcome summary judgment.
 
 (Id.,
 
 at pp. 1509-1513.) Here, of course, there were specific subordination agreements and the sellers approved the conditions of the loan before signing them.